**FILED**

JAN 0 4 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>801 Cherry St., 19th Floor<br>Fort Worth, Texas 76102 | §<br>§<br>§<br>§<br>§ |
| Plaintiff, | § |
| v. | § |
| T.V. AZTECA, S.A. de C.V., AZTECA HOLDINGS,<br>S.A. de C.V., RICARDO SALINAS PLIEGO,<br>PEDRO PADILLA LONGORIA, and<br>LUIS ECHARTE FERNANDEZ, | § |
| Defendants. | §<br>§<br>§ |

CASE NUMBER  1:05CV00004

JUDGE: Emmet G. Sullivan

DECK TYPE: General Civil

DATE STAMP: 01/04/2005

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission (the "Commission"), files this Complaint against TV Azteca, S.A. de C.V., Azteca Holdings, S.A. de C.V., Ricardo B. Salinas Pliego, Pedro Padilla Longoria and Luis Echarte Fernandez and would respectfully show the Court as follows:

### SUMMARY

1.    Ricardo B. Salinas Pliego ("Salinas"), Pedro Padilla Longoria ("Padilla") and Luis Echarte Fernandez ("Echarte"), officers and directors of TV Azteca, S.A. de C.V. ("TV Azteca"), a Mexican reporting company with securities listed on the New York Stock Exchange and its parent corporation, Azteca Holdings, S.A. de C.V. ("Azteca Holdings"), a Mexican company with securities traded on the Over-the-Counter Bulletin Board, engaged in a scheme to violate the antifraud, reporting, certification, books and records, and internal controls provisions of the U.S. federal securities laws.

2.      Recognizing an opportunity to reap a tremendous personal profit at the expense of investors located in the United States and Mexico, Salinas coordinated a scheme to conceal from TV Azteca's board of directors, the Commission and the investing public the related party nature of several transactions involving the settlement of a contractual dispute between Nortel Networks Corporation ("Nortel") and Unefon, S.A. de C.V. ("Unefon"), a subsidiary of TV Azteca.

3.      Salinas, TV Azteca's chairman and controlling stockholder, played a significant role in Unefon's defense against Nortel's claim for payment of approximately $368 million for telecommunications equipment provided to Unefon.   At the same time, Salinas played a significant role in Unefon's attempt to sell certain cellular telephone spectrum rights, licensed to it by the Mexican government but pledged against the Nortel debt.   Seizing an opportunity to make a substantial personal profit, Salinas acquired Nortel's claims for payment against Unefon through a nominee company at a substantial discount.   After the sale of its cellular spectrum rights, and three months after Salinas acquired the debt, Unefon payed the full face value of the Nortel debt to Salinas' nominee company and, as he fully planned, Salinas realized a windfall profit of $109 million dollars at the expense of TV Azteca's investors.

4.      To facilitate his scheme and prevent the public outcry that would have ensued had investors learned of his misconduct, Salinas and other members of TV Azteca's management engaged in a cover-up of Salinas's involvement.   Salinas, Padilla and Echarte, over the course of seven months and for the purpose of ensuring that Salinas would be able to consummate the transactions that would provide him the windfall profits he sought, concealed material information from investors, analysts, attorneys, TV Azteca's audit committee and related party transactions committee, and the company's full board of directors.   And, as if $109 million in

illicit profits were not enough, Salinas, joined by Padilla, sold substantial amounts of TV Azteca

stock into the uninformed marketplace further profiting from the illicit scheme.

5.     The Commission, in the interest of protecting the investing public, brings this

action seeking to permanently enjoin defendants from further violations of the federal securities

laws and seeking an accounting, disgorgement of defendants' ill-gotten gains, plus prejudgment

interest thereon, civil monetary penalties as allowed by law and officer and director bars against

Salinas and Padilla.

## JURISDICTION

6.     This Court has jurisdiction over this action pursuant to Section 27 of the

Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78aa].

7.     Defendants, directly and indirectly, made use of the means or instrumentalities of

interstate commerce and/or the mails in connection with the transactions described in this

Complaint.

## DEFENDANTS

8.     **TV Azteca, S.A. de C.V.,** a Mexican corporation headquartered in Mexico City,

is the second largest television broadcasting company in Mexico. TV Azteca's American

depository receipts ("ADRs") are registered with the Commission pursuant to Section 12(b) of

the Exchange Act and are listed on the NYSE; the company's underlying ordinary participation

certificates trade on the Mexican stock exchange.

9.     **Azteca Holdings, S.A. de C.V.,** a Mexican holding company headquartered in

Mexico City, beneficially owns 55% of the outstanding stock of TV Azteca. Azteca Holdings'

debt securities are registered with the Commission pursuant to Section 12(b) of the Exchange

Act and trade on the U.S. Over-the-Counter Bulletin Board Market.

10.     **Ricardo B. Salinas Pliego**, age 49 and a Mexican citizen, became the chairman of the board of directors and the controlling shareholder of TV Azteca in 1993. Salinas became a director of Unefon in 1999 and the president of Unefon in 1998. Since 1997, Salinas has served as the chairman of the board and president of Azteca Holdings, and he served as CEO from 1997 until April 2004. Salinas is also a director of Azteca Holdings.

11.     **Pedro Padilla Longoria**, age 38 and a Mexican citizen, became a director of TV Azteca in 1993. Padilla was the CEO of TV Azteca from October 2001 until July 14, 2004, when he was promoted to CEO of Grupo Salinas, a holding company for various Salinas controlled entities. Padilla also serves on the board of directors of Azteca Holdings, Unefon and several other companies controlled by the Salinas family and their affiliates.

12.     **Luis Echarte Fernandez**, age 59 and a U.S. citizen, became a director of TV Azteca in 1999. Echarte is also the president and CEO of Azteca America, a TV Azteca subsidiary based in New York, and is the chief financial strategist for Grupo Salinas. From November 1999 to July 2001, Echarte was the CFO of TV Azteca; from November 1994 to November 1999, he was the CFO of Grupo Elektra. Echarte currently serves on the board of directors of Grupo Elektra.

## BACKGROUND

13.     In 1999, Unefon entered into several agreements with Nortel, whereby Nortel agreed to supply Unefon with communications equipment, and agreed to loan Unefon up to $618 million to finance the equipment sales. Nortel's loan was secured by liens against all of Unefon's assets, including its cellular telephone spectrum rights granted by the Mexican government. In August 2002, Unefon withheld a $6 million interest payment that was due. Litigation ensued, with each party filing actions in Mexico and New York.

14.     During late 2002 and early 2003, Unefon and Nortel engaged in sporadic settlement discussions. On October 3, 2002, Padilla, a Unefon board member, sent a letter to Nortel's general counsel proposing a plan to resolve their differences; at the time Unefon owed Nortel approximately $368 million. Unefon and Nortel failed to make any progress until May 2003 when Nortel, with trial approaching, offered to settle with Unefon in exchange for $200 million. Unefon rejected Nortel's initial offer, but countered in late May with an offer to pay $150 million. In early June, Nortel's counsel began drafting the settlement documents. The first draft "Restructuring Agreement" sent to Unefon on June 9, 2003 reflected Nortel's desire to completely extinguish Unefon's debt in exchange for approximately $150 million in cash to be paid directly by Unefon.

15.     According to Unefon, it was "unable" to raise the $150 million. Salinas and Padilla claimed that TV Azteca was unwilling to provide the funds. Salinas and Moises Saba Masri ("Saba"), Unefon's chairman, filled the void by personally stepping into the settlement as lenders. On June 9, 2003, Salinas and Saba informed Adrian Steckel, Unefon's CEO, of their decision to purchase the Unefon debt from Nortel for $107 million; Unefon would pay the remaining $43 million for certain Nortel receivables (related to Nortel's agreement to provide Unefon equipment, software, services and technical support). Unefon did not disclose to Nortel Salinas and Saba's participation in the debt purchase, but rather proposed to Nortel that a "third party" purchase the Unefon debt. After exploring several options, Unefon and Nortel agreed that the Unefon debt would be sold to Codisco Investments, LLC ("Codisco"), an entity to be formed in Delaware for the sole purpose of acquiring the Unefon debt. On June 16, 2003, Unefon, Nortel and Codisco executed the settlement documents. Under the terms of the settlement, Nortel reduced Unefon's indebtedness from approximately $368 million to $325 million; and

Codisco, owned equally by Salinas and Saba, purchased the $325 million debt for only $107 million. Shortly thereafter, Codisco (i.e. Salinas and Saba) agreed to extend the maturity of the Unefon indebtedness until 2013.

16. The Nortel settlement was structured to conceal the involvement of Salinas and Saba. Codisco's ownership was listed in public filings as Trust F/14, an unidentifiable Mexican trust. Salinas and Saba also used attorneys-in-fact to sign the agreements on behalf of Codisco. A few weeks after closing the Nortel settlement transactions, Codisco transferred its interest in the Unefon debt, in equal parts, to an Irish entity controlled by Saba and a newly formed Luxembourg entity controlled by Salinas. Salinas used TV Azteca employees to coordinate the formation of the Luxembourg entity and the transfer of funds to and from Luxembourg.

17. In late September 2003, just three months after Codisco purchased the Unefon debt from Nortel, Unefon prepaid the entire $325 million, despite the prior extension of the maturity through 2013. The prepayment in full afforded Salinas and Saba each a $109 million profit. The bulk of the funds Unefon used to pay off Salinas and Saba was derived from a transaction in which Unefon leased its excess cellular spectrum to the largest mobile phone operator in Mexico, a subsidiary of America Movil S.A. de C.V. that operates under the name "Telcel." Under the terms of the transaction, Unefon agreed to a 16-year lease of spectrum to Telcel in exchange for two advance payments totaling $268 million. Shortly after receiving the funds from Telcel, Saba and Padilla, as signatories for Unefon, jointly authorized $325 million in payments to Irish and Luxembourg entities controlled by Saba and Salinas, respectively. Unefon secured the $57 million balance of the funds used to repay Salinas and Saba by entering into short-term lending arrangements with TV Azteca affiliates. The total profit to Salinas and Saba,

given their purchase of the debt for $107 million, was $218 million, or $109 million to each of them.

18.     Salinas, Saba and others knew at the time of the Nortel settlement in June 2003 that from the sale of its cellular spectrum rights, Unefon would be able to pay the entire Nortel debt and net Salinas and Saba a significant windfall. As early as April 2003, Telcel's president contacted Saba to discuss Unefon's subleasing a significant amount of its unused spectrum to Telcel. Initially, Unefon proposed a 16-year lease term for total consideration of between $600 million and $1 billion. Telcel countered with a shorter two to four-year lease for $30 million to $60 million. On May 13, 2003, while Telcel and Unefon were still negotiating a potential spectrum lease, Nortel informed Unefon that it would accept $200 million to fully satisfy Unefon's approximate $368 million debt to Nortel. Two days later, Unefon and Telcel suspended their negotiations. Shortly thereafter, Unefon and Nortel settled their dispute on June 16, 2003.

19.     On June 30, 2003, Nortel's liens against Unefon's assets were transferred to Codisco. Approximately one month later, Saba, on behalf of Unefon, approached Telcel with a new proposal involving an 8-year lease valued at $240 million. Within days of the contact by Saba, Unefon and Telcel reached agreement on nearly all material terms. The parties reached a final agreement on the Telcel spectrum transaction in late September 2003. Telcel prepaid $268 million to Unefon pursuant to that agreement.

20.     Salinas and Saba intentionally structured the Telcel transaction in a manner that maximized their immediate personal gain. From the outset of the negotiations with Telcel, Unefon sought to receive all the cash upfront, either directly from Telcel or by assigning the expected payment stream under the lease to a third party. On September 8, 2003, Unefon

informed Telcel that it would not agree to any terms that did not require either an upfront payment or an option for Unefon to monetize the payment stream by assigning its rights to a third party. An upfront payment assured Salinas and Saba immediate recoupment of their "investment" in the Unefon debt, plus an aggregate $218 million profit. Prior to executing the final agreement, Telcel acceded to Unefon's demand and agreed to pay $268 million in advance, allowing Unefon to repay Salinas and Saba straightaway.

21.     To conceal Salinas's windfall, TV Azteca's management withheld material information about the Unefon debt transactions, and otherwise misled investors, analysts, attorneys, and TV Azteca's audit committee, related party transactions committee, and full board of directors. From June 16, 2003 until January 9, 2004, TV Azteca failed to disclose that Salinas and Saba owned Codisco, and from approximately October 1, 2003 through January 9, 2004, TV Azteca failed to disclose that Salinas and Saba each received $109 million in profits when Unefon repaid its $325 million debt. In furtherance of the scheme, TV Azteca made false and misleading statements in press releases, in filings with the Commission and to analysts. In addition, TV Azteca management concealed from the company's independent directors Salinas's involvement in the Unefon debt transactions and advice from its attorneys at the time, Akin Gump Strauss Hauer & Feld ("Akin Gump"). Moreover, the Unefon and TV Azteca boards and audit committees were not informed of the Nortel settlement transactions until well after the June 16, 2003 closing. As a result, the TV Azteca board was not given an opportunity to protect TV Azteca's investors from Salinas's self dealing.

22.     On June 16, 2003, TV Azteca announced the Nortel settlement transactions in a press release appended to a Form 6-K filed with the Commission, but did not disclose that Salinas and Saba were the purchasers of the debt. The press release also contained a statement

that TV Azteca's board of directors had been informed of Unefon's settlement with Nortel on June 16, 2003. In fact, the full TV Azteca board was not informed of the Nortel settlement until TV Azteca's July 22, 2003, board meeting. Even then, the board was not informed that Salinas and Saba owned Codisco nor had TV Azteca's related party transactions committee or its audit committee reviewed or approved the Nortel settlement transactions or the related sale of the indebtedness to Codisco. These failures occurred in spite of, and rendered false and misleading, TV Azteca's own policies set forth in its Commission-filed 2002 Form 20-F ("TV Azteca's 2002 20-F"), which stated that the related party transactions committee reviews "any" material transaction with a related party of the company or its controlling shareholder.

23.     In its 2002 Form 20-F, filed with the Commission on June 30, 2003, TV Azteca disclosed the Nortel settlement and the sale by Nortel of Unefon's $325 million indebtedness to Codisco. Specifically, the 2002 TV Azteca 20-F included the following disclosure under the heading "Recent Developments":

NORTEL SETTLEMENT

On June 16, 2003, Unefon reached a settlement with Nortel pursuant to which Unefon and Nortel released each other from all obligations arising out of the procurement agreement, finance agreement or any related agreements and terminated all actions and proceedings of any kind between the parties or involving the parties and their counsel, in the U.S. and Mexico. Unefon and Nortel also terminated the procurement agreement and entered into a new supply agreement. In connection with the settlement, Unefon paid an aggregate of US$43.0 million to Nortel to be applied to accounts receivable and to a reduction in the total amount of debt owed by Unefon to Nortel to US$325.0 million. Concurrently with the settlement, Codisco Investments LLC ("Codisco") purchased the

US$325.0 million debt of Unefon from Nortel. Unefon has announced that the term of this debt between Unefon and Codisco is to be amended to provide for, among other things, an extension of the maturity date until June 15, 2013.

TV Azteca's disclosure, however, was misleading because it failed to disclose material facts regarding the Unefon debt transactions — that Salinas and Saba each owned half of Codisco and that Codisco paid only $107 million for the indebtedness.

24.     TV Azteca's 2002 20-F included similar disclosure under the heading "Item 4. Information on the Company—Other Operations." The disclosure in the 20-F classified the Nortel settlement and the related debt sale to Codisco as "Material Contracts," as opposed to and distinguished from "Related Party Transactions." The disclosure in TV Azteca's 2002 20-F stated:

MATERIAL CONTRACTS

The Company's agreements with related parties are described in "Related Party Transactions" under "Item 7. Major Shareholders and Related Party Transactions.

Unefon has entered into a new supply agreement with Nortel and has issued a note to Codisco, to whom Unefon's indebtedness to Nortel was assigned pursuant to an assignment and assumption agreement between Codisco and Nortel, in connection with the equipment and working capital needs of its mobile wireless telecommunications network. See "Item 4. Information on the Company—Other Operations" for a description of these and related agreements.

TV Azteca's disclosure, however, was misleading because it failed to disclose material facts regarding the Unefon debt transactions — that Salinas and Saba each owned half of Codisco and that Codisco paid only $107 million for the indebtedness and falsely presented the contracts as

non-related party transactions. Moreover, TV Azteca did not divulge these facts under the "Related Party Transactions" section of its 2002 20-F.

25. TV Azteca also failed to file, as exhibits to its 2002 20-F, material contracts relating to the Nortel settlement and debt sale to Codisco — contracts that would have revealed that Salinas and Saba were affiliated with Codisco. Padilla, in his capacity as TV Azteca's CEO, signed the misleading TV Azteca 2002 20-F, and signed the related Sarbanes-Oxley certification.

26. Azteca Holdings, a holding company that beneficially owns 55% of the outstanding stock of TV Azteca, is owned and controlled indirectly by the Salinas family. In 2002, TV Azteca's operations provided substantially all of Azteca Holdings' revenues, and TV Azteca equity securities constituted substantially all its assets. Azteca Holdings' 2002 Form 20-F filed with the Commission on June 30, 2003, included substantially the same disclosure as TV Azteca's 2002 20-F. As a result, Azteca Holdings also failed to disclose that Salinas owned 50% of Codisco. In addition, Azteca Holdings failed to file, as exhibits to its Form 20-F, material contracts relating to the Nortel settlement and debt sale to Codisco that would have shown that Salinas and Saba were affiliated with Codisco. Salinas, as president and CEO of Azteca Holdings, signed the misleading Azteca Holdings 2002 Form 20-F, and signed the related Sarbanes-Oxley certification.

27. Compounding the fraud facilitated by the false filings with the Commission, on July 4, 2003, Salinas publicly denied any connection to Codisco. The denial, in response to a query by a Reuters reporter regarding market concern that he or Saba may have been affiliated with Codisco, appeared in an article entitled "Mexico's Salinas Says No Links to Investor Group," which ran in various publications. On information and belief, a partner at Akin Gump discovered the Reuters article containing Salinas's denial realized that it was false and told

Padilla that corrective disclosure was necessary under U.S. securities laws. Despite this advice, TV Azteca, Salinas and Padilla did nothing to correct Salinas's false denial.

28.     At TV Azteca's July 22, 2003 board meeting, Adrian Steckel, Unefon's CEO, gave a presentation in which he informed TV Azteca's board about the Unefon settlement transactions. In that presentation, Steckel told the directors, without further elaboration, that Unefon's $325 million indebtedness had been transferred to "Codisco." Salinas and Padilla, each of whom sits on the Unefon board and knew that Salinas and Saba owned Codisco, made no mention of Salinas and Saba's involvement in the Unefon debt transactions to TV Azteca's board, its related party transactions committee or its independent auditors.

29.     On August 11, 2003, Azteca Holdings filed with the Commission a misleading F-4 Registration Statement that included substantially the same disclosure about the Nortel settlement that was included in its 2002 Form 20-F. Azteca Holdings filed the F-4 as part of a contemplated exchange offer of new registered senior notes for outstanding notes, which were previously issued in private placements. As such, Azteca Holdings' disclosure continued to be misleading because it failed to disclose that Salinas and Saba each owned half of Codisco. Salinas and Padilla signed the misleading F-4 as Azteca Holdings' directors, and Salinas signed the related Sarbanes-Oxley certification as Azteca Holdings' president and CEO.

30.     On information and belief, after learning of the Telcel spectrum transaction and the repayment of the Unefon debt, Akin Gump sent a memorandum to Padilla on October 15, 2003, that set forth in detail Akin Gump's argument for additional disclosure. In the memorandum, Akin Gump concluded that "Salinas's economic ownership interest in Codisco is a material fact." Padilla did not inform TV Azteca's board, or its relevant committees, of Akin Gump's advice regarding related party disclosure, even though a board meeting took place just

six days after Akin Gump sent the October 15 letter to Padilla. On November 5, 2003, Akin Gump emailed a memorandum to Padilla that reiterated the firm's prior disclosure advice. Once again, Padilla did not make any mention of Akin Gump's advice to the independent directors, or to the appropriate directorial committees.

31.     During an October 17, 2003, meeting, Padilla and Carlos Hesles Flores, TV Azteca's CFO, told analysts from MFS Investments that it was "unknown" who purchased the Nortel debt. The analysts, who were appropriately skeptical of Padilla's explanation, sent a follow-up email to Salinas as follows:

> In our meeting today with Pedro Padilla and Carlos we were informed that it is unknown who purchased the debt of Nortel and what the current owner of that debt is going to do with the position. We just request that if a related party purchased the debt that there is total transparency as to minority shareholders in the case it can affect them in any way.
>
> . . .
>
> As we discussed with you and Luis in our last call, there seems to be an important re-rating of TV Azteca given its excellent recent transparency and care of minority shareholders. Minority shareholders would probably be very disappointed if there was even a hint of a transaction were minority shareholders would be hurt and/or if transparency is an issue.

32.     Salinas forwarded the email to Echarte, who then called the MFS analyst directly to respond on behalf of Salinas. Echarte assured the analyst that "they were very conscious that any type of misbehavior would be punished by the market." Salinas clearly knew that the information Padilla, Flores and Echarte provided to the MFS analysts was false, and he did nothing to correct the misinformation.

33.   At TV Azteca's October 21, 2003 board meeting, Adrian Steckel, Unefon's CEO, gave a presentation to Nortel he informed the TV Azteca board that Unefon had paid in full its $325 million debt owed to a "private group of investors." Salinas and Padilla were present but did nothing to inform the independent board members that Salinas and Saba comprised the "private group of investors" and received a $218 million profit. On information and belief, TV Azteca's management sat silent about the related party issue despite the fact that just days earlier, on October 15, 2003, Akin Gump had sent a letter to Padilla explaining that "Salinas's economic ownership interest in Codisco is a material fact" that should have been disclosed to shareholders.

34.   When TV Azteca's management realized that Akin Gump intended to apprise the full board of its ignored disclosure advice, management concocted a story to convince the law firm that disclosure was unnecessary. On December 10, 2003, Padilla told Akin Gump lawyers that Saba was the sole owner of Codisco, Salinas had no interest in Codisco and that Salinas had merely "loaned" half the money Codisco used to buy the debt from Nortel. Akin Gump, unswayed by these additional "facts," concluded "that these transactions nevertheless are required to be disclosed pursuant to U.S. securities laws."

35.   On December 12, 2003, Akin Gump sent a letter to TV Azteca's management and its full board of directors informing them of the firm's resignation and citing Section 307 of the Sarbanes-Oxley Act of 2003. In the letter, Akin Gump notified the directors that the firm had reported to the company's management what it believed to be a material violation of U.S. securities laws and was not satisfied with the company's response. Prior to receiving the December 12, 2003 letter, TV Azteca's board had never been told of Akin Gump's instruction to furnish additional public disclosure. In fact, prior to receiving the Akin Gump letter, TV Azteca's independent directors, including the members of its audit and related party transactions

*SEC v. TV Azteca, S.A. de C.V., et al.*
COMPLAINT
Page - 14

committees, were completely unaware of Salinas and Saba's ownership interests in Codisco or their $218 million profit.

36. Until TV Azteca's independent board members received copies of Akin Gump's December 12, 2003, resignation letter, they were completely unaware that Salinas owned 50% of Codisco and that he had netted a $109 million profit. In an attempt to placate the independent board members, Echarte sent them a letter, dated December 18, 2003, explaining management's justification for not disclosing Salinas's involvement in the Unefon debt transactions. Echarte copied Salinas and Padilla on the email distribution of the letter. Echarte's letter included numerous false and misleading statements including the false representation that Salinas had no interest in Codisco, but merely "loaned" Saba half the money Codisco used to buy the debt from Nortel "with no profit on the transaction." The letter included a number of other false statements: i) that Nortel "required" that its rights be acquired by either Saba and TV Azteca jointly or Saba and Salinas jointly; ii) that in order to rid Unefon of "painful" litigation, Salinas "accepted to be an assignee of Saba, with no benefit to him [Salinas];" and iii) that the Telcel spectrum transaction that generated the funds used to repay the $325 million was "unknown to all parties until September 2003." In fact, Nortel made no such demands of Unefon; Salinas reaped a $109 million profit; and negotiations preceding the Telcel spectrum transaction commenced in April of 2003 and were completed by September 2003.

37. Echarte arranged for a conference call with the independent directors on December 19, 2003, to discuss the information included in his December 18 letter. In preparation for the call, Echarte sent an email to Salinas coaching Salinas to mislead the other directors during the call. In the email, Echarte stated:

". . . Michael [Gearon, an independent director] thinks that during a board meeting you might have mention that you did not know who was buy the debt from Nortel. This was also mention in the letter from Akim in regards to a Dow Jones interview. No one has said anything about to me nor to Michael so if it comes up you just deny it as far as mentioning it during the board meeting, and as to Dow Jones you should say that you had no authority to speak to them about Saba."

Echarte attached a copy of his letter to the board to the email and instructed Salinas to review it prior to the call. On the Echarte-led December 19 call, Salinas confirmed as fact the false statements in Echarte's letter. When asked by the directors about his involvement in the debt transactions, Salinas asserted that he did not benefit and that he only "loaned money" to Saba. A few days later, the New York Times published an article about the improprieties underlying the Nortel-Unefon-Telcel deals. During the first week of January 2004, Padilla and Echarte met with all of the independent directors individually to inform them that Salinas had in fact "benefited" from the transactions despite what Salinas had told them on the December 19 conference call.

38.     The New York Times, on information and belief, after receiving a copy of the Akin Gump memorandum dated October 15, 2003 and the firm's December 12, 2003, resignation letter, published an article on December 24, 2003, entitled "Lawyers Take Suspicions On TV Azteca To Its Board," detailing the Unefon debt transactions and the reasons for Akin Gump's resignation as TV Azteca's securities counsel. According to the article, Akin Gump withdrew because the firm believed that TV Azteca had committed a material violation of the U.S. securities laws by failing to make disclosures recommended by the firm. The article also noted that the transactions may have yielded a profit of more than $218 million to Salinas and

"another related party." After seeing the article, Echarte sent an email to Salinas and Padilla stating that: "The damage is done and the situation that we didn't want to explain openly is now in the hands of the public. At the end of this process, when the committee reaches a decision, what they are going to require for publication is going to be more than we would have liked." By the end of trading on December 26, 2003, the second day following the publication of the New York Times article, the price of TV Azteca's ADRs had fallen from $9.80 to $8.75, a 10.7% decline.

39.    Between January 5 and January 8, 2004, Padilla and Echarte met with a number of analysts in New York in an attempt to control the market's reaction to the December 24 New York Times article. Padilla and Echarte continued to mislead analysts during the January meetings. Padilla and Echarte told analysts that the negotiation of the Telcel spectrum transaction, which generated the funds Unefon used to repay its $325 million debt to Nortel, did not begin until September of 2003, when Telcel supposedly approached Unefon for the first time about a prospective spectrum transaction. The false statement was intended to quell speculation that the Telcel transaction had been arranged in advance of the Nortel settlement. Padilla and Echarte also told analysts that the TV Azteca board refused to inject the funds needed for the Nortel settlement; in fact, the TV Azteca board had no knowledge of the negotiations preceding the Nortel settlement. Finally, Padilla and Echarte falsely told the analysts that Akin Gump changed its opinion only after Salinas reaped a significant windfall. The analysts relied upon Padilla and Echarte's false statements and repeated them in their reports.

40.    On January 9, 2004, under pressure from regulatory authorities in Mexico and the U.S., TV Azteca issued a press release confirming that Salinas and Saba each "indirectly" owned

half of Codisco. By the close of trading on January 12, 2004, the price of TV Azteca's ADRs had fallen to $7.76, an almost 21% decline from its December 23, 2003 close.

41.     From June 16, 2003 until January 9, 2004, TV Azteca failed to disclose material information about the Unefon debt transactions. During that same time period, Salinas and Padilla sold large quantities of shares TV Azteca stock on the Mexican stock exchange. From numerous stock sales conducted between June 18, 2003 and December 11, 2003, Salinas grossed approximately $9.3 million. In each case, Salinas was fully aware that the market did not possess all the material facts about the Unefon debt transactions. He also made statements intended to bolster TV Azteca's stock price and mislead the market about his intention to sell his own TV Azteca shares. For example, when a Dow Jones reporter asked Salinas about recent analyst downgrades in June 2003, Salinas responded that he was issuing a "screaming buy" rating for TV Azteca and that "[t]here's a lot of bad information about TV Azteca in the market, but that's always an opportunity for smart and savvy investors. . . . In any case, I couldn't care less, I'm not planning to sell my shares." On or about the day Salinas spoke to the reporter, he sold approximately 4.7 million Mexican TV Azteca shares, grossing US$ 1.9 million. Salinas also sold TV Azteca shares for approximately US$ 4 million on the eve of Akin Gump's resignation as company counsel.

42.     In addition, Salinas never filed with the Commission, as required, a Schedule 13D reporting his ownership of TV Azteca securities, despite the statement in TV Azteca's 2002 20-F that Salinas beneficially owned 60% of TV Azteca's outstanding shares. Salinas also failed to file appropriate amendments to disclose his substantial stock trades on the Mexican exchange during the relevant period.

43.     Between October 13, 2003 and November 3, 2003, Padilla sold shares of Mexican TV Azteca stock, grossing approximately $6.6 million. The sales took place after Akin Gump advised Padilla that TV Azteca had violated the federal securities laws by failing to disclose the material fact that Salinas and Saba were the direct beneficiaries of the Unefon debt transactions.

## FIRST CLAIM
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

44.     Plaintiff Commission repeats and incorporates paragraphs 1 through 43 of this Complaint by reference as if set forth *verbatim*.

45.     Defendants TV Azteca, Azteca Holdings, Salinas, Padilla and Echarte, in connection with the purchase or sale of securities, have: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operate as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

46.     Defendants TV Azteca, Azteca Holdings, Salinas, Padilla and Echarte engaged in the conduct described in this claim knowingly or with severe recklessness.

47.     By reason of the foregoing, TV Azteca, Azteca Holdings, Salinas, Padilla and Echarte violated, and unless enjoined, will continue to violate Section 10(b) of the Exchange Act. [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CLAIM
### Violations of Section 13(a) of the Exchange Act and
### Rules 12b-20, 13a-1 and 13a-16

48.     Plaintiff Commission repeats and incorporates paragraphs 1 through 43 of this Complaint by reference as if set forth *verbatim*.

49.     Defendants TV Azteca and Azteca Holdings, in the manner set forth above, failed to file with the Commission, in accordance with rules and regulations the Commission has prescribed, information and documents required by the Commission to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to Section 12 of the Exchange Act and annual reports and quarterly reports as the Commission has prescribed, and to include in such reports all material information as necessary to make the required statements, in light of the circumstances, not misleading.

50.     By reason of the foregoing, TV Azteca and Azteca Holdings violated, and unless enjoined, will continue to violate Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-16 thereunder. [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-16].

**THIRD CLAIM**
**Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act**

51.     Plaintiff Commission repeats and incorporates paragraphs 1 through 43 of this Complaint by reference as if set forth *verbatim*.

52.     TV Azteca and Azteca Holdings failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected TV Azteca and Azteca Holdings' transactions and dispositions of its assets.

53.     TV Azteca and Azteca Holdings failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions would be recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

54.     By reason of the foregoing, TV Azteca and Azteca Holdings violated, and unless enjoined, will continue to violate Sections 13(b)(2)(A) and (B) of the Exchange Act. [15 U.S.C. § 78m(b)(2)(A)].

## FOURTH CLAIM
### Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-2

55.    Plaintiff Commission repeats and incorporates paragraphs 1 through 43 of this Complaint by reference as if set forth *verbatim*.

56.    Defendants Salinas and Padilla knowingly circumvented TV Azteca's system of internal accounting controls and/or knowingly falsified TV Azteca's books and records required to be kept under Section 13 of the Exchange Act. Additionally, Salinas and Padilla, directly or indirectly, made materially false or misleading statements, or omitted to state, or caused another person to omit to state, material facts necessary to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with an audit or examination of financial statements.

57.    By reason of the foregoing, Salinas and Padilla violated, and unless enjoined, will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## FIFTH CLAIM
### Violations of Rule 13a-14 of the Exchange Act

58.    Plaintiff Commission repeats and incorporates paragraphs 1 through 43 of this Complaint by reference as if set forth *verbatim*.

59.    On June 30, 2003, Salinas certified a report filed by Azteca Holdings and Padilla certified a report filed by TV Azteca, on Forms 20-F pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 and Rule 13a-14 promulgated thereunder, stating that "they had reviewed the reports; based upon their knowledge, the reports did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading; and based upon his

knowledge, the financial statements and information contained in each report fairly present in all material respects the financial condition, results of operations and cash flows of the issuer."

60.     Salinas and Padilla knew or were reckless in not knowing that the reports they certified contained untrue statements of material fact and omitted to state material facts necessary to make the statements made therein, in light of the circumstances under which the statements were made, not misleading.

61.     By reason of the foregoing, Salinas and Padilla violated, and unless enjoined, will continue to violate Rule 13a-14 [17 C.F.R. § 240.13a-14] promulgated under Section 302 of the Sarbanes-Oxley Act of 2002.

**SIXTH CLAIM**
**Violations of Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2**

62.     Plaintiff Commission repeats and incorporates paragraphs 1 through 43 of this Complaint by reference as if set forth *verbatim*.

63.     At all relevant times, Salinas beneficially owned more than five percent of TV Azteca's outstanding shares of common stock.

64.     Section 13(d) of the Exchange Act and Rule 13d-1 provide that any person who acquires, directly or indirectly, the beneficial ownership of more than five percent of any class of equity securities registered under Section 12 of the Exchange Act must file a statement on Schedule 13D with the Commission. The statement must include, *inter alia,* specified information about the acquisition, and the type and number of shares held. The Schedule 13D must be filed within 10 days after the acquisition.

65.     Since at least August 15, 1997, Salinas has beneficially owned more than five percent of TV Azteca's common stock, and engaged in transactions in the sale of these

securities, and therefore was required, but failed, to report his ownership and dispositions of these securities to the Commission.

66.     By reason of the foregoing, Salinas violated, and unless enjoined, will continue to violate Section 13(d) of the Exchange Act and Exchange Act Rules 13d-1 and 13d-2.

**SEVENTH CLAIM**
**Aiding and Abetting Violations of Section 10(b)**
**of the Exchange Act and Rule 10b-5**

67.     Plaintiff Commission repeats and incorporates paragraphs 1 through 43 of this Complaint by reference as if set forth *verbatim*.

68.     Based on the conduct alleged herein, TV Azteca violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by making public misrepresentations regarding the related-party nature of the Unefon debt transactions.

69.     Defendant Echarte, in the manner set forth above, knowingly or recklessly provided substantial assistance to TV Azteca in connection with its violations of Section 10(b) and Rule 10b-5 as alleged herein.

70.     By reason of the foregoing, Echarte aided and abetted, and unless enjoined will continue to aid and abet, TV Azteca's violations of Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b) and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

**EIGHTH CLAIM**
**Aiding and Abetting Violations of Section 13(a) of the**
**Exchange Act and Rules 12b-20, 13a-1 and 13a-16**

71.     Plaintiff Commission repeats and incorporates paragraphs 1 through 43 of this Complaint by reference as if set forth *verbatim*.

72.     Based on the conduct alleged herein, TV Azteca and Azteca Holdings violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-16 thereunder.

73.    Defendants Salinas, Padilla and Echarte, in the manner set forth above, knowingly or, with severe recklessness, provided substantial assistance to TV Azteca or Azteca Holdings, as issuers of securities registered pursuant to Section 12 of the Exchange Act, in their failing to file with the Commission, in accordance with rules and regulations the Commission has prescribed, information and documents required by the Commission to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to Section 12 of the Exchange Act and annual reports and quarterly reports as the Commission has prescribed.

74.    By reason of the foregoing, Salinas, Padilla and Echarte aided and abetted, and unless enjoined will continue to aid and abet, TV Azteca and Azteca Holdings' violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-16 thereunder. [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-16].

### NINTH CLAIM
### Aiding and Abetting Violations
### of Section 13(b)(2)(A) and (B) of the Exchange Act

75.    Plaintiff Commission repeats and incorporates paragraphs 1 through 43 of this Complaint by reference as if set forth *verbatim*.

76.    Based on the conduct alleged herein, TV Azteca and Azteca Holdings violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

77.    Defendants Salinas, Padilla and Echarte, in the manner set forth above, knowingly or, with severe recklessness, provided substantial assistance to TV Azteca or Azteca Holdings in connection with their failure to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected TV Azteca and Azteca Holdings' transactions and dispositions of its assets.

78.     Defendants Salinas, Padilla and Echarte, in the manner set forth above, knowingly

or, with severe recklessness, provided substantial assistance to TV Azteca and Azteca Holdings

in connection with their failure to devise and maintain a system of internal accounting controls

sufficient to provide reasonable assurances that transactions are recorded as necessary to permit

preparation of financial statements in conformity with generally accepted accounting principles.

79.     By reason of the foregoing, Salinas, Padilla and Echarte aided and abetted, and

unless enjoined will continue to aid and abet, TV Azteca and Azteca Holdings' violations of

Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.   [15 U.S.C.  §§ 78m(b)(2)(A),

(b)(2)(B)].

## PRAYER

The Commission respectfully requests that the Court:

80.     Permanently restrain and enjoin TV Azteca, Azteca Holdings, Salinas, Padilla and

Echarte from violating, or aiding and abetting, directly or indirectly, the provisions of law and

rules alleged in this Complaint.

81.     Order that Salinas, Padilla and Echarte provide an accounting of and disgorge all

ill-gotten gains, plus pre-judgment and post-judgment interest, resulting from their participation

in the alleged conduct, including salaries, bonuses, stock, or other compensation of any kind.

82.     Order TV Azteca, Azteca Holdings, Salinas, Padilla and Echarte to pay civil

money penalties, plus post-judgment interest, pursuant to Section 21(d)(3) of the Exchange Act

[15 U.S.C. § 78u(d)(3)] in an amount to be determined by the Court.

83.     Order that Salinas and Padilla, under Section 21(d)(2) of the Exchange Act [15

U.S.C. § 78u(d)(2)], are prohibited from acting as officers or directors of any issuer that has a

class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that

is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

     84.    Grant such other relief as this Court may deem just or appropriate.


Dated: January 4 , 2005

                            Respectfully submitted,

                            *Harold Loftin, Jr.*

                            Harold R. Loftin, Jr.
                            (Attorney in Charge)
                            Texas Bar No. 12487090
                            Attorney for Plaintiff
                            SECURITIES and EXCHANGE COMMISSION
                            801 Cherry St., 19th Floor
                            Fort Worth, Texas 76102
                            Office:  (817) 978-6447
                            Fax:    (817) 978-4927
                            Email:  Loftinh@sec.gov